10-1230-cr
United States v. Roberts

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2010

(Argued: May 20, 2011      Decided: September 29, 2011)

Docket No. 10-1230-cr

_____

UNITED STATES OF AMERICA,

*Appellee*,

—v.—

O'NEAL ROBERTS,

*Defendant-Appellant*.

_____

Before:

RAGGI, LYNCH, and WALLACE, *Circuit Judges.*[*]

_____

On appeal from a judgment of conviction for violation of federal narcotics laws

entered after trial in the United States District Court for the Eastern District of New York

(Dora L. Irizarry, *Judge*), defendant argues that (1) his statements pursuant to a proffer

agreement should not have been admitted into evidence because (a) they were the product

of economic coercion, and (b) his attorney's conduct did not trigger the proffer agreement's

_____

[*] The Honorable J. Clifford Wallace, United States Court of Appeals for the Ninth
Circuit, sitting by designation.

1

waiver of Fed. R. Evid. 410; (2) his Sentencing Guidelines range should not have been enhanced for abuse of a position of trust, see U.S.S.G. § 3B1.3; and (3) the ordered $3,160,000 forfeiture was miscalculated. We identify no merit in the first two arguments but remand for further fact-finding as to the last.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.

———————————————

STEPHANIE M. CARVLIN, Law Office of Stephanie M. Carvlin, New York, New York, *for Defendant-Appellant*.

WALTER M. NORKIN (Susan Corkery, *on the brief*), Assistant United States Attorneys, Of Counsel, *on behalf of* Loretta E. Lynch, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

———————————————

REENA RAGGI, *Circuit Judge*:

Defendant O'Neal Roberts was convicted after a jury trial in the Eastern District of New York (Dora L. Irizarry, *Judge*) of crimes committed while working for American Airlines at John F. Kennedy International Airport ("JFK"), specifically, conspiracy to import and actual importation of five or more kilograms of cocaine and conspiracy and attempt to distribute and possess with intent to distribute the same quantity of cocaine. See 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(ii), 846, 952(a), 960(a)(1), (b)(1)(B), and 963.[1] In this appeal from

_____

[1] Roberts was also tried on several counts of money laundering, see 18 U.S.C. §§ 1956(a)(2)(B)(i), (h), which were dismissed at trial. Thus, we do not further discuss those charges.

the judgment entered on March 31, 2010, Roberts argues that (1) his statements made pursuant to a proffer agreement should not have been received in evidence because (a) they were elicited through economic coercion, and (b) defense counsel's conduct did not trigger the provision in Roberts's proffer agreement waiving Fed. R. Evid. 410; (2) his Sentencing Guidelines range was erroneously enhanced for abuse of a position of trust, see U.S.S.G. § 3B1.3; and (3) the ordered $3,160,000 forfeiture was miscalculated, see 21 U.S.C. § 853; Fed. R. Crim. P. 32.2. We identify no merit in the first two arguments, but we conclude that the last requires further fact-finding to determine whether the conspiracy's proceeds were realized at the wholesale or retail level. Accordingly, we affirm all aspects of the judgment except for the forfeiture order, which we vacate, remanding the case for further proceedings consistent with this opinion.

## I.  **Background**

This section summarizes the trial evidence supporting Roberts's conviction. Other facts pertinent to Roberts's challenges to the judgment of conviction are detailed in the discussion points addressing those issues.

### A.  The November 5, 2005 Importation of Five Kilograms of Cocaine

On November 5, 2005, United States Customs and Border Protection ("CBP") agents investigated possible criminal activity involving American Airlines flight 1384, which had arrived at JFK from Barbados at 10:41 p.m. ("Barbados flight"). On meeting the flight, Agent Michael Roessel's attention was drawn to a person offloading the rear of the aircraft

3

whom Roessel had never previously seen doing such work. Rather, Roessel knew the individual to be assigned to the control office, where he handed out work schedules and assignments to other American Airlines employees.[2]

Agents proceeded to search each item offloaded from the Barbados flight. At one point, Roessel observed that Roberts had stopped offloading items even though some remained on the aircraft. When, after a half hour, Roberts did not resume offloading, the agents instructed him to remove all remaining items from the plane. The first removed container was empty. Inside the second, however, agents found a canvas bag containing five brick shaped packages, which subsequent laboratory analysis confirmed contained a total of 5,038 grams — just over five kilograms — of 84% pure cocaine. Immigration and Customs Enforcement ("ICE") Agent William McAlpin testified that the seized cocaine had a wholesale value of $121,000, and a retail value of $403,000.

B.    Beckford Implicates Roberts in the Charged Crimes

Roberts was not arrested on November 5, 2005. Nevertheless, his role in smuggling the drugs seized from the Barbados flight that night was detailed at trial by Clive Beckford, an American Airlines ramp agent whose duties included loading and unloading aircraft. Beckford testified that he, Roberts, and two other American Airlines employees, Matthew

_____

[2] Although Agent Roessel made no in-court identification of this person, the government argued that the totality of the evidence demonstrated that it was Roberts. Because we are obliged to view the evidence in the light most favorable to the government, see In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 198 (2d Cir. 2008), we henceforth refer to the individual as Roberts.

4

James and Victor Bourne, had been involved in smuggling drugs into the United States through JFK since at least 2003. Beckford explained that drugs would be loaded onto American Airlines planes in foreign countries. To avoid heightened government scrutiny of international cargo, the conspirators frequently did not remove the drugs when planes first arrived in the United States. Rather, they waited until an aircraft completed at least one domestic flight, whereupon the drugs would be unloaded on the plane's next arrival at JFK. To effect this scheme, the conspirators tracked a plane's movement on computer printouts, with Bourne having general responsibility for making "everything run[] smoothly," Trial Tr. at 356, and Roberts, as crew chief, ensuring that trusted employees offloaded drugs from the identified flights. Beckford stated that between 2003 and his own 2009 arrest, the conspirators followed this procedure for approximately twenty flights, one of which was a test flight, another of which imported marijuana, and the remainder of which all imported bricks of cocaine. Beckford stated that the number of cocaine bricks he saw removed from individual flights ranged from as few as four or five to as many as fifteen.

With respect to November 5, 2005, Beckford testified that he was working at JFK when Roberts told him that drugs would be on the Barbados flight. Beckford proceeded to perform his regular loading and unloading duties until Bourne advised him that the Barbados flight had landed. Bourne and Beckford then drove to the gate in a tractor, where they saw Roberts unloading the plane using a machine called a "Cochran." At the same time, however, they saw a large number of CBP agents around the plane, whereupon Bourne and

5

Beckford left the area without stopping.

C.    Roberts's Statements to Federal Authorities

In response to an implicit defense assertion that Beckford was not present when the Barbados flight was offloaded on November 5, 2005, a matter discussed in more detail in Part II.A.2 of this opinion, see infra **[11-26]**, ICE Agent Heather O'Malley was permitted to testify to certain parts of a proffer statement that Roberts made while attempting to cooperate with federal authorities on November 2, 2006. With his attorney present, Roberts told federal officials that on November 5, 2005, he had been summoned to a meeting by Victor Bourne, who instructed Roberts to remove baggage from the Barbados flight. Roberts adjusted crew schedules to ensure that employees who would normally have offloaded the Barbados flight would be occupied elsewhere. Roberts then called Clive Beckford and told him that Bourne needed Beckford to remove bags from the Barbados flight. When Roberts arrived at the gate for the Barbados flight, which had landed early, Bourne was already waiting on a freight tractor. Bourne and Beckford then began unloading baggage from the flight, while Roberts operated a Cochran. At one point, Beckford told Roberts that any containers remaining on the aircraft were empty, whereupon Beckford and Bourne drove away with the removed baggage. Roberts proceeded to the front of the aircraft where he offloaded what he thought were empty containers. While this account of events differed in some respects from that provided by Beckford, it conclusively refuted defense counsel's implicit assertion that Beckford was not present for the unloading of the Barbados flight.

6

D.    Sentence and Forfeiture

Found guilty on all drug counts, Roberts was sentenced to concurrent terms of 240 months' imprisonment — a variance from his 265-292 month Guidelines range — concurrent terms of five years' supervised release, and a total special assessment of $400. Roberts was further ordered to forfeit $3,160,000 in drug proceeds realized by conspirators in the course of the charged crimes.

This appeal followed.

II.    **Discussion**

A.    Challenges to the Admission of Roberts's November 2, 2006 Proffer Statements

Roberts asserts that his conviction must be vacated because it was obtained through inadmissible evidence, specifically, Agent O'Malley's testimony about the statements Roberts made to federal authorities on November 2, 2006, pursuant to a proffer agreement. Roberts argues that the statements should have been suppressed as involuntary because they were obtained through economic coercion. Alternatively, he submits that his attorney's conduct was insufficient to trigger the provision in Roberts's proffer agreement waiving the protections of Fed. R. Evid. 410. We reject both arguments as without merit.

1.    Economic Coercion

Prior to trial, Roberts unsuccessfully moved in the district court for suppression of all statements that he made to federal authorities in the course of three proffer sessions held on October 16, October 31, and November 2, 2006. Roberts asserted that he was questioned at

7

the first session without counsel or advice of rights, and that his statements at the final two sessions were induced by economic coercion, specifically, by threats that he would lose his job at the airport unless he provided federal authorities with information about criminal activity at JFK. The district court conducted a hearing at which Roberts testified, as well as six witnesses called by the government, i.e., an Assistant U.S. Attorney, three federal agents, and two of Roberts's former attorneys, all of whom had arranged or attended one or more of the proffer sessions. The court found the government's witnesses entirely credible, but found Roberts, who was caught in numerous lies and contradictions during the hearing, "unworthy of belief." United States v. Roberts, No. 07-CR-425, 2009 WL 700188, at *7 (E.D.N.Y. Mar. 13, 2009). Based on these assessments, the district court found that, contrary to Roberts's assertions, he had been represented by counsel and advised of his rights before questioning at the first session, and had not been subjected to economic coercion at the second and third sessions. See id. at *8-10.

Roberts does not challenge the district court's findings of fact. Thus, we construe the evidentiary record in the light most favorable to the government. See In re Terrorist Bombings of U.S. Embassies in E. Afr., 552 F.3d 177, 198 (2d Cir. 2008). Roberts also does not assert legal error in the district court's rejection of his advice of rights or counsel claim. On appeal, he claims only that the district court applied the wrong legal standard in evaluating his economic coercion claim. Specifically, he faults the district court for requiring a threat of job loss to establish economic coercion. We review this claim of legal error de

8

novo, see id., and conclude that it is without merit.

The district court's correct understanding of the legal standard applicable to a claim of economic coercion is apparent from its statement that a significant "threat of economic harm" or "economic sanctions" — whatever the form — could violate a defendant's Fifth Amendment right against self incrimination. United States v. Roberts, 2009 WL 700188, at *9 (internal quotation marks omitted). This is consistent with Supreme Court precedent holding that government officials may not compel statements through threat of "economic or other sanctions capable of forcing the self-incrimination which the [Fifth] Amendment forbids." Minnesota v. Murphy, 465 U.S. 420, 434 (1984) (internal quotation marks omitted); see Garrity v. New Jersey, 385 U.S. 493, 499-500 (1967). This does not mean that the "mere risk of any adverse economic consequence" rises to the level of coercion; the economic threat must "reasonably appear[] to have been of sufficiently appreciable size and substance to deprive the accused of his free choice to admit, to deny, or to refuse to answer." United States v. Montanye, 500 F.2d 411, 415 (2d Cir. 1974) (internal quotation marks omitted). This determination depends on an assessment of the totality of the circumstances. See Miller v. Fenton, 474 U.S. 104, 115 (1985); United States v. Anderson, 929 F.2d 96, 99 (2d Cir. 1991).

In assessing the totality of the evidence in this case, the district court focused on threats of job loss not because it mistakenly thought that job loss was a necessary element of any economic coercion claim, but because that was the type of economic coercion to

9

which Roberts himself claimed to have been subjected. In his affidavit, testimony, and briefs, Roberts consistently maintained that law enforcement authorities had made statements to him that threatened him with loss of his employment at American Airlines. The district court, however, specifically found Roberts unworthy of belief. Thus, the only statement made by any credible witness even relevant to Roberts's economic coercion claim was Agent O'Malley's acknowledgment that she might have told Roberts, at the end of the second proffer session, that if his cooperation ended, ICE agents would be required to report his arrest to CBP, the agency charged with deciding who had access to restricted airport areas.

The district court did not err in concluding that advising Roberts of the required agency procedures of both ICE and CBP, made without any reference to adverse economic consequences for Roberts, did not so plainly threaten Roberts's employment as to deprive him of free choice in deciding whether to speak with government authorities. In urging otherwise, Roberts submits on appeal that "work on the ramp required him to have Customs access." Def.'s Br. at 46. Even if this is true, no credited evidence indicates that American Airlines would necessarily fire an employee for losing ramp access. See United States v. Solomon, 509 F.2d 863, 872 (2d Cir. 1975) (rejecting coercion challenge where record demonstrates "no certainty what penalty" employer might prescribe); see also Garrity v. New Jersey, 385 U.S. at 494, 497-98 (identifying economic coercion from state statute requiring public officers to forfeit their position if they invoked their Fifth Amendment privilege); United States v. Stein, 233 F.3d 6, 15 (1st Cir. 2000) ("Where . . . invocation of the Fifth

Amendment does not, by itself, result in forfeiture of the job or license in question, the fact that claiming the Fifth may, as a practical matter, result in damage to one's chances of retaining the privilege at stake does not necessarily establish a constitutional violation.").

Moreover, quite apart from any agent's mention of future CBP-approved ramp access, Roberts had to have known that his continued employment at American Airlines was in jeopardy from the moment he was implicated in a scheme to use that company's planes to smuggle drugs. So too was his liberty. Whether Roberts's interests in his liberty and his employment were best served by maintaining his innocence or negotiating a plea agreement, by remaining silent or cooperating, undoubtedly presented him with hard choices. But the Fifth Amendment "does not protect against hard choices." United States v. Solomon, 509 F.2d at 872. It protects against coercion that deprives a defendant of the opportunity to make such choices for himself. Here, the district court applied the correct legal standard to Roberts's coercion claim, and we identify no error in its determination that coercion had not been demonstrated from the totality of the evidence.

### 2. The Proffer Agreement Waiver

#### a. Legal Principles

Roberts submits that his proffer statements were, in any event, inadmissible under Fed. R. Evid. 410, and that the district court erred in finding his attorney's conduct to have triggered a provision of his proffer agreement waiving the protections of that rule. We disagree.

11

Rule 410 provides that any statements made by a defendant in the course of plea discussions that do not result in a guilty plea are thereafter not admissible against him. See also Fed. R. Crim. P. 11(f). Because the rule constitutes an exception to the general principle that all relevant evidence is admissible at trial, we construe it narrowly and recognize that its protections can be waived. See United States v. Mezzanatto, 513 U.S. 196, 205 (1995); United States v. Barrow, 400 F.3d 109, 116 (2d Cir. 2005). Roberts's proffer agreement contains such a waiver, permitting the government to use statements made pursuant to the agreement as substantive evidence to "rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of [Roberts] at any stage of a criminal prosecution." Proffer Agreement at 1. In considering Roberts's challenge to the district court's finding that this waiver provision was triggered by the conduct of Roberts's counsel at trial, we construe the agreement de novo, but we review the district court's evidentiary ruling admitting particular statements only for abuse of discretion. See United States v. Barrow, 400 F.3d at 117.

In Barrow, we construed a similarly worded waiver provision in a proffer agreement to constitute "an expansive waiver" reaching "any evidence, whether offered directly or elicited on cross-examination," as well as any "factual assertions," whether made "directly or implicitly." Id. at 118-19 (internal quotation marks omitted). We specifically recognized that factual assertions could be implied by counsel in an opening statement or in questions posed on cross-examination. See id. At the same time, we warned that, even in cases of

12

expansive waivers, district courts need "to consider carefully what fact, if any, has actually been implied to the jury before deciding whether proffer statements fairly rebut it." Id. at 119.

Particular caution is required when the purported fact is asserted by counsel rather than through witness testimony or exhibits. The latter undoubtedly constitute evidence and, thus, necessarily imply some fact. By contrast, counsel's statements are not admissible evidence. Thus, arguments or questions challenging "the sufficiency of government proof," id., or the credibility of a witness "without a factual assertion contradicting facts admitted in the proffer statement," do not trigger a waiver provision, United States v. Oluwanisola, 605 F.3d 124, 133 (2d Cir. 2010). To illustrate, Barrow drew a distinction between questions challenging a witness's perception or recollection of an event, which do "not necessarily imply that the event did not occur, only that the witness may not have seen or reported it accurately," and questions accusing the witness of fabricating an event, which in the context of that case "implicitly assert[ed] that no such [event] ever took place." 400 F.3d at 119; cf. United States v. Oluwanisola, 605 F.3d at 132-33 (cautioning that, in other contexts, questions implying witness fabrication would not imply that event admitted by defendant did not take place). The distinction is more easily stated than applied. In close cases, the identification of what facts are being implied by counsel's questions and arguments may depend on the "unique insights" a district court gains from actually seeing and hearing these matters pursued in the dynamic context of a trial. United States v. Barrow, 400 F.3d at 119.

13

We are disinclined to second guess reasonable assessments informed by such insights.  This case, however, presents no such close calls because, as discussed in the next section, the district court admitted Roberts's proffer statements to rebut facts implied through documentary evidence.

     b.  <u>Circumstances Leading to Admission of the Proffer Statements</u>

  With the aforementioned legal principles in mind, we review the facts leading to the district court's decision to admit particular statements made by Roberts at the November 2, 2006 proffer session.  Not only do these circumstances fail to demonstrate the error urged by Roberts; they reveal the district court's commendable care in reviewing three separate applications to admit Roberts's proffer statements to rebut facts insinuated by defense counsel first in his opening statement, then on cross-examination of government witness Beckford, and finally through documentary evidence.  Although skeptical throughout of counsel's claim that his actions were intended to avoid the assertion of any facts contradicted by his client's proffer statements, the district court denied the first two motions and granted the third only when defense counsel insisted on offering documentary evidence that implied a fact — Beckford's absence from the airport at the time the Barbados flight was offloaded — contradicted by Roberts's proffer statements.

     i.  <u>Defense Counsel's Opening Statement</u>

  In opening to the jury, Roberts's counsel did not argue simply that the government would fail to produce sufficient evidence to carry its burden, that Beckford would prove not

14

to be a credible witness, or that the government would offer no evidence to corroborate his testimony. Rather, counsel charged the government with engaging in a "reckless" prosecution of his client based on "bad information" that it had failed to corroborate. Trial Tr. at 294. Indeed, counsel charged the government with recklessness five times in the first five paragraphs of his opening. After thus establishing government recklessness as the defense theme, counsel proceeded to argue that "portions" of Beckford's story regarding the November 5 seizure "do not add up," and that if the government "would have checked it properly, they would [have] see[n] that." Id. at 295-96.

The government first moved to offer Roberts's proffer statements to rebut this charge of recklessness and the implied factual assertion that it had made no effort to corroborate Beckford's information. The proffer statements would have shown that the government had corroboration, from Roberts himself, for critical aspects of Beckford's testimony about the charged drug-trafficking scheme.

In opposition, defense counsel asserted that he only argued that "portions" of Beckford's account did not add up, which did not necessarily reference matters discussed by Roberts in his proffer statements. The district court was not obliged to accept this narrow characterization of the implied fact given that, in his opening, counsel further told the jury that the government's failure to corroborate Beckford with respect to the unspecified "portions" of his story "call[ed] his whole account of what took place that day into serious question," id. at 296, an inference contradicted by Roberts's corroboration of the critical core

15

of Beckford's testimony. Moreover, counsel argued that when the jury drew this inference for itself, it would ask itself "how come [the government] didn't see it." Id. Counsel provided the answer: "because the agents working on this case were reckless." Id.

We need not here decide whether Roberts's proffer statements were admissible to rebut these assertions of a "completely reckless" prosecution "without any kind of verification" of Beckford's story, id. at 332, because the district court, acting well within its discretion, denied the government's motion to admit, noting the possibility for unfair prejudice and the early stage of the proceeding. See United States v. Barrow, 400 F.3d at 119 (observing that waiver "does not mandate receipt of the proffer statements in evidence" and noting district court's "considerable discretion" to exclude even relevant evidence pursuant to Fed. R. Evid. 403). The court did, however, "put the defense on notice that should this theory" re-emerge or should "some other theory emerge that is contrary to the admissions" Roberts made in his proffer statements, the court would "allow the government to renew its application." Trial Tr. at 343-44.

## ii. Beckford's Cross-Examination

The government did renew its application to admit when, on cross-examination, defense counsel attempted to impeach Beckford's testimony that he was working at JFK on November 5, 2005, the date drugs were seized from the Barbados flight, with questions suggesting that he was, in fact, in Miami. Defense counsel opposed the application, insisting that he questioned Beckford only "about being in Miami at a certain time" on November 5,

16

which did not "necessarily mean he was never in New York or never in JFK" on that date. Id. at 444-46.

In fact, counsel first asked Beckford simply if he was "actually in Miami" on November 5. Id. at 415. Upon receiving a negative answer, counsel showed Beckford a document not in evidence, identified as a "Passenger Activity Report," and asked if Beckford now "recall[ed] being in Miami on November 5th, 2005." Id. at 416. When Beckford said he did not "remember this," counsel asked if the document "refresh[ed] [his] recollection as to where [he] might have been" on that date. Id. Only after Beckford stated that he did not recall what was shown in the document did counsel repeat his question by reference to a particular time, asking Beckford if he recalled being "in Miami on November 5, 2005 at about 2:52 p.m." Id. at 417. Beckford said he did not remember "because, like I said, I was there [i.e., JFK], I was working when the seizure went down. I was right there." Id. This response indicates that Beckford plainly understood the line of questions to be challenging his testimony that he was at JFK on November 5 at the time drugs were seized. The district court was of the same view, rejecting counsel's argument that he was only seeking to impeach that part of Beckford's testimony reporting that he had arrived for work at JFK on November 5 in the mid-afternoon without insinuating that Beckford was not there later in the day to witness events leading to the cocaine seizure.

Once again, we need not decide whether counsel's actions triggered the waiver provision of the proffer agreement because the district court continued to exercise its

17

discretion in favor of Roberts and denied the government's motion to admit the proffer statements. It explained that if counsel would strictly adhere to his representation that he was only questioning Beckford's presence at JFK in the mid-afternoon on November 5, Roberts's proffer statements would not be admissible to contradict that limited assertion because "there [was] that window of opportunity where Mr. Beckford, even if he had been in Miami [at 2:52 p.m.] could have returned back to JFK and could have been at the airport" when the Barbados flight arrived at 10:41 p.m., as Roberts acknowledged. Id. at 451. Nevertheless, the district court cautioned defense counsel that he was "walking a fine line" and should "watch very carefully" that he stayed on the side that was prompting the court to deny the government's application. Id. at 451-52. Further, the court advised that it would instruct the jury that counsel's questions were not evidence. See United States v. Barrow, 400 F.3d at 119 (observing that, where assertion is implied by counsel's questions, district court might "instruct[] the jury to ignore the factual assertion stated or implied, rather than admit defendant's proffer statements in rebuttal").

     iii.  Defense Counsel's Proffer of Documentary Evidence

  The morning after this ruling, defense counsel advised the court that he intended to offer into evidence two documents recently provided by the government: (1) American Airlines flight lists showing that Beckford had traveled from Jamaica to Miami and from Miami to JFK on November 5, 2005, arriving in New York at 9:38 p.m.; and (2) American Airlines records showing that Beckford first "swiped into work" that night at 12:03 a.m., i.e.,

18

very early on November 6, and well after the Barbados flight was unloaded. Trial Tr. at 464.

Reviewing the documents, the district court immediately recognized that they implied the

fact it had originally understood the defense to be insinuating in the prior day's cross-

examination of Beckford, i.e., "that Mr. Beckford was nowhere near JFK on November 5th,"

an assertion contradicted by Roberts's proffer statements. Id. at 466. Defense counsel

maintained that he would use the documents only to undermine Beckford's testimony

regarding his activities at JFK before 9:38 p.m. on November 5, but his own argument

revealed that a broader inference would effectively be implied without need for counsel to

say so expressly:

> I'm not going further to say [Beckford] was not at JFK Airport. However, they're assuming he was there. There's nothing to prove that he was there other than his own statements which have now been contradicted . . . . His testimony regarding being at JFK has been contradicted for three quarters of the day, obviously [he] wasn't there until 9:38 p.m. if he was there at all.
> . . .
> The import, the facts are he wasn't there for certain periods of time when he said he was there. After 9:38 p.m., they want to argue he was there? I don't have to necessarily say anything. The thing is, up to this point, I haven't said that he was not there at all.

Id. at 470-71 (emphasis added).

Considering the proffered documents in light of defense counsel's opening and cross-

examination, the district court concluded that it was "disingenuous" for counsel to suggest

that he was offering documents to disprove Beckford's presence at the airport in the

afternoon to challenge Beckford's credibility but not to imply that Beckford also was not

there at the relevant time of the flight unloading. Id. at 476. Nevertheless, continuing to

19

exercise caution, the district court advised counsel that it would not admit Roberts's proffer statements in rebuttal if the record stood as it was and the documents were not placed into evidence. See United States v. Barrow, 400 F.3d at 119 (recognizing district court discretion to exclude proffer statements when factual assertion was only inadvertently and briefly interjected into proceedings "and counsel agrees not to pursue the matter further"). On the other hand, if counsel introduced the documents, the government would be allowed to offer the proffer statements to rebut the implied fact that Beckford was not at the airport at the time the Barbados flight was unloaded. Only when counsel insisted that he "want[ed] these documents to come in," did the court grant the government's motion to admit. Trial Tr. at 481.

The court then offered the parties a number of options with respect to introduction of the documentary evidence: (1) the defense could have the record custodian, then in court, return on a later date so that the documents could be put into evidence on the defense case; (2) the defense could call the witness out of order that day; (3) the government could call the witness and introduce the documents; or (4) the parties could stipulate to the documents' admissibility. When the government expressed a preference for the third option "if the defense is intent on having these exhibits come in," Roberts's counsel voiced no objection to that procedure, simply reiterating, "I do want the documents in evidence." Id. at 482.[3]

---

[3] This record belies Roberts's argument on appeal that the government, rather than Roberts, sought introduction of Beckford's swipe-card records. The government may have moved these records as well as the airline passenger lists into evidence, but only after

20

Accordingly, the government moved the documents into evidence, and then rebutted their implication that Beckford was not at the airport on the night of November 5 by having Agent O'Malley testify to court-approved excerpts from Roberts's proffer statements. See supra at **[6]**.

c. The District Court Correctly Found Defense Counsel's Actions To Have Triggered the Proffer Agreement's Waiver Provision

On this record, we identify no merit in Roberts's contention that the district court abused its discretion in finding that his attorney's actions triggered the waiver provision of his proffer agreement. To the extent defense counsel used argument and cross-examination to imply facts contradicted by Roberts's proffer statements, the district court was prepared to address such conduct simply through jury instructions advising that attorney statements were not evidence. Defense counsel, however, went further, insisting that documentary evidence be put before the jury that strongly implied that Beckford could not have been at the gate on November 5 when the Barbados flight was offloaded. Passenger-list documents showed that Beckford's flight from Miami to New York did not land at JFK until 9:38 p.m., while swipe-card records showed, in defense counsel's own characterization, that Beckford "did not swipe into work until November 6th at three minutes after midnight." Trial Tr. at 464 (emphasis added). Had counsel limited his proffer to the flight information, his

Roberts's counsel repeatedly stated that he sought their admission. Because Roberts did not object to this procedure below or on appeal, we have no need to address it further. We conclude only that the district court properly held Roberts responsible for facts implied by this documentary evidence.

argument that the proof impeached only Beckford's testimony that he had been working at JFK on the afternoon of November 5 might have been more convincing. But that representation is undermined by counsel's simultaneous proffer of the swipe-card evidence. Roberts had no reason to offer those documents except to suggest that Beckford did not report for work at JFK until just after midnight on November 6, by which time it would have been too late to witness events occurring more than an hour earlier with respect to the offloading of the Barbados flight. Indeed, in his closing argument to the jury, defense counsel used the documentary evidence to urge just such a factual inference:[4]

> American Airlines Flight 1384 from Barbados arrived at JFK at 10:41 p.m. on November 5th, 2005. That's about one hour and three minutes after Clive Beckford's flight from Miami landed at JFK. . . .
>
> [D]id Clive Beckford sneak out on to the ramp and meet Victor Bourne after he got off that flight from Miami that night? . . . [B]efore you even say maybe he did, you first have to ask how would that have been possible?
>
> Charles Schmidt, an American Airlines senior security representative and witness for the Government, said that it is not possible for someone to go from the terminal when a flight arrives out to the ramp area without swiping his employee ID to gain access to the secure ramp area. . . .
>
> Now, Mr. Schmidt did say that a person could walk from a jet bridge . . . to the ramp without swiping your ID card by walking down the stairs connected to the jet bridge. But Clive Beckford said that he did not walk from a jet bridge to the ramp on November 5th, 2005.
>
> Mr. Schmidt did say that an employee can engage in the practice of piggybacking and enter a secure area without swiping his own employee ID

---

[4] Defense counsel did not argue to the district court or on appeal that he altered his summation because Roberts's proffer statements had already been admitted.

22

card by following directly behind another employee who does swipe. But once again, Clive Beckford said he did not engage in the practice of piggybacking on November 5th, 2005.

Mr. Schmidt further testified that Government Exhibit Number 904 shows that Clive Beckford did swipe his employee ID card at the east baggage area [of] . . . the American Airline terminal . . . at 12:03 a.m., three minutes after midnight on November 6th, 2005.

The problem for Clive Beckford and the Government is that it's not November 5th, 2005 and it's one hour and 22 minutes after the flight from Barbados landed at JFK. So not only do you have to consider the fact that this face-to-face conversation with Mr. Roberts at the beginning of the shift in the afternoon of November 5th, 2005 did not happen, you now have to ask the question how did Clive Beckford get to the ramp on November 5th, 2005 to see what he claims to have seen and do what he claims to have done?

Id. at 720-22. The factual assertion thus being urged from the documents was that Beckford could not have been on the ramp for the offloading of the Barbados flight. Because that fact was rebutted by Roberts's proffer statements, the district court properly admitted excerpts from those statements into evidence.[5]

_____

[5] Defense counsel effectively acknowledged that Roberts's proffer statements rebutted the implicit assertion that Beckford was not present for the offloading when he continued the quoted argument as follows:

Did [the government] give you any evidence to help you figure it out? . . . If they did not resolve this story line by the close of the evidence, the verdict has to be 'not guilty.' The Government knows this. So they try to give you evidence to tie up the loose ends of this story line, and they may point you to [a] statement that they said Mr. Roberts made.

Trial Tr. at 722. Attempting to mitigate the effect of Roberts's statements, defense counsel argued that the government had "trouble understanding what Mr. Roberts says from time to time," and asked the jury to question whether Agent O'Malley got "the statements right." Id. at 723-24.

United States v. Oluwanisola, 605 F.3d 124, relied on by Roberts, warrants no different conclusion. In that case, the defense did not put documentary evidence before the jury to imply facts that contradicted the defendant's proffer statements. Rather, counsel cross-examined a government agent in a way that cast doubt on his credibility. See id. at 129-30 (noting that defense counsel asked agent if his supervisor had memorialized agent's account of events in a report). Reversing the district court's finding that such questioning was, by itself, sufficient to trigger the waiver provision of the proffer agreement, this court observed that the query could not be construed as "an implicit factual assertion" that events testified to by the agent had not occurred "when the defendant ha[d] not directly or indirectly contradicted the facts he admitted in his proffer." Id. at 132-33; see also United States v. Barrow, 400 F.3d at 119 (noting that "challenging a witness's perception or recollection of an event does not necessarily imply that the event did not occur").

In this case, however, defense counsel did more than use cross-examination to question Beckford's credibility. As already noted, the district court acknowledged that such credibility challenges would not trigger the proffer agreement's waiver provision under our case law. Instead, counsel went further, proffering documentary evidence that implied a particular fact, i.e., that Beckford could not have been present for the offloading of the 10:41 p.m. Barbados flight because his flight from Miami did not arrive in New York until 9:48 p.m. on November 5, and Beckford did not swipe into work at JFK until 12:03 a.m. on November 6. Unlike the cross-examination in Oluwanisola, this proffer did not simply

24

impugn Beckford's credibility. It also put documentary evidence before the jury that implied a fact that was contradicted by Roberts's proffer statements expressly placing Beckford at the gate during the offloading of the Barbados flight, i.e., sometime after 10:41 p.m. but before 12:03 a.m. Accordingly, we identify no error in the district court's determination that defense counsel triggered the proffer agreement's waiver provision or in its admission of excerpts from Roberts's proffer statements.

B.        Challenge to Sentencing Guidelines Calculation

Roberts submits that his sentence is unreasonable because it is infected by procedural error in the calculation of his Sentencing Guidelines range. See United States v. Cavera, 550 F.3d 180, 189-90 (2d Cir. 2008) (en banc). Specifically, he faults the district court for applying a two-point enhancement to his offense level for abuse of a position of trust. See U.S.S.G. § 3B1.3. The argument fails on the merits.

An abuse of trust enhancement is warranted if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." Id.; see United States v. Friedberg, 558 F.3d 131, 133 (2d Cir. 2009). We have held that the "professional or managerial discretion" required to establish a position of trust, U.S.S.G. § 3B1.3 cmt. n.1, "must be entrusted to the defendant by the victim" of the offense, United States v. Broderson, 67 F.3d 452, 455-56 (2d Cir. 1995); see also United States v. Barrett, 178 F.3d 643, 647 (2d Cir. 1999) (noting that "victim's perspective" is utilized in applying abuse of trust enhancement). Victim status "depends

25

upon the circumstances of the case." United States v. Cusack, 229 F.3d 344, 349 (2d Cir. 2000). Thus, crimes may have more than one victim, and a § 3B1.3 enhancement may apply whether the person whose trust a defendant abused was the "primary" or a "secondary" victim of the crime. Id.; see United States v. Barrett, 178 F.3d at 647.

On appeal, Roberts asserts that to the extent he abused a position of private trust conferred on him by his employer, American Airlines, to commit the crimes of conviction, no § 3B1.3 enhancement was warranted because American Airlines was not a victim of those crimes. Rather, the only victim was the United States. At the outset, we note that Roberts did not make this argument in the district court. There, he argued only that the government failed to establish that he used his crew chief position at American Airlines to facilitate the commission or concealment of his crimes. In these circumstances, we review his victim challenge only for plain error, which requires "'(1) error, (2) that is plain, and (3) that affects substantial rights.'" United States v. Paul, 634 F.3d 668, 674 (2d Cir. 2011) (internal brackets omitted) (quoting Johnson v. United States, 520 U.S. 461, 466-67 (1997)). If those conditions are satisfied, we may then exercise our discretion to notice a forfeited error if it "seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal brackets and quotation marks omitted).

We identify no such plain error in the district court's identification of American Airlines as one victim of Roberts's drug trafficking. American Airlines entrusted Roberts with discretion to assign crews to load and unload its airplanes. Roberts abused that trust by

26

exercising his discretion in such a way as to facilitate a drug smuggling operation. He assigned co-conspirators to offload airplanes used to bring drugs into the United States, while at the same time diverting crews unconnected to the conspiracy to other aircraft, thereby ensuring that they did not discover the secreted contraband.

As a consequence, Roberts's abuse of his position of trust exposed his employer to harm, for example, public criticism for its employee's criminal conduct, with possible adverse consequences to the airline's business operations. This, by itself, permitted the district court to identify American Airlines as a victim of Roberts's crimes. See United States v. Cusack, 229 F.3d at 349 (holding party a victim where defendant's abuse of trust cast party in "extremely unfavorable light" (internal quotation marks omitted)); see also CNN, 2 Former Airline Workers at JFK Indicted on Drug Smuggling Charges (Oct. 14, 2010), http://articles.cnn.com/2010-10-14/justice/new.york.airport.cocaine_1_baggage-handlers-airline-employees-airline-workers?_s=PM:CRIME (describing indictment of Bourne and co-conspirator); U.S. DEA, Former American Airlines Employee Sentenced to 240 Months in Prison for Smuggling Drugs into the United States (Mar. 15, 2010), http://www.justice.gov/dea/pubs/states/newsrel/2010/nyc031510.html. That conclusion is reinforced by the fact that Roberts's abuse of trust further exposed his employer to criminal scrutiny and the possibility of fines or forfeiture. See 19 U.S.C. § 1584(a)(2) (imposing on master or owner of vessel $1,000 per ounce fine for cocaine found on board and not appearing in manifest); 21 U.S.C. § 881(a)(4) (subjecting to forfeiture "[a]ll conveyances,

27

including aircraft" used in the unlawful transport of controlled substances).

In these circumstances, Roberts cannot identify error, much less plain error, in the application of a § 3B1.3 enhancement to his Guidelines calculation based on his abuse of the position of trust he held at American Airlines.[6] Accordingly, we identify no procedural error in his sentence.

C.      Challenge to Forfeiture Calculation

Roberts challenges the $3,160,000 forfeiture order in his case, asserting that the record evidence does not support a finding that the conspiracy obtained this amount in proceeds from its drug trafficking activities. The district court arrived at the challenged amount by finding that the conspiracy smuggled at least seventy-nine kilograms (i.e., 79,000 grams) of cocaine into the United States and then multiplying that weight by its estimated street value of $40 per gram. We review the district court's factual findings regarding forfeiture for clear error and its legal conclusions de novo. See United States v. Sabhnani, 599 F.3d 215, 261 (2d Cir. 2010), cert. denied, 131 S. Ct. 1000 (2011).

Title 21 U.S.C. § 853(a)(1) states that a defendant convicted of a drug crime "shall forfeit . . . any property constituting, or derived from, any proceeds the person obtained, directly or indirectly, as the result of" the crime of conviction. In the case of a narcotics

---

[6] In light of this conclusion, we need not consider whether a § 3B1.3 enhancement was further warranted by Roberts's abuse of a position of public trust, specifically, his abuse of access to restricted airport areas, a trust conferred by federal CBP authorities, to facilitate his drug trafficking scheme.

conspiracy, this mandatory liability is joint and several among all conspirators. See United States v. Benevento, 836 F.2d 129, 130 (2d Cir. 1988); cf. United States v. Fruchter, 411 F.3d 377, 384 (2d Cir. 2005) (applying joint and several liability for criminal proceeds from racketeering enterprise). The procedures applicable to a forfeiture determination are detailed in Fed. R. Crim. P. 32.2. The government's burden of proof with respect to forfeiture is a preponderance of the evidence. See United States v. Kalish, 626 F.3d 165, 168 (2d Cir. 2010).

In this case, the government sought to carry its burden by proving the quantity of cocaine dealt by the conspiracy and then urging that the amount be multiplied by the price it could have commanded. We identify no error in the district court's use of this approach. See United States v. Treacy, 639 F.3d 32, 47-48 (2d Cir. 2011) (stating that district court's forfeiture calculations may be based on "reasonable estimate" in light of "available information"). Specifically, we reject Roberts's argument that the evidence in this case was insufficient to permit a preponderance finding as to the quantity of cocaine smuggled into the United States by the charged conspiracy. Clive Beckford testified that in the period from 2003 to 2009, the conspiracy imported between four and fifteen kilograms of cocaine on at least seventeen occasions, not including one test trip, one trip importing marijuana, and the November 5, 2005 trip from Barbados resulting in a seizure of drugs. Roberts's proffer statements — the use of which Roberts did not dispute at sentencing — corroborated Beckford's accounts and suggested that his estimates may have been low. Roberts admitted

29

personally unloading fifteen bricks of cocaine on one occasion and estimated that the conspiracy imported thirty to forty kilograms of cocaine several times a week. This evidence supports the district court's conservative estimate that the conspiracy imported fifteen kilograms of cocaine on at least one occasion and four kilograms of cocaine on each of sixteen occasions, for a total of seventy-nine kilograms, or 79,000 grams, of cocaine. See United States v. Treacy, 639 F.3d at 47-48; cf. United States v. Kalish, 626 F.3d at 168 (affirming forfeiture calculation based on defendant's routine fraudulent activity).

Similarly, the evidence was sufficient to permit the district court to find by a preponderance that the conspiracy distributed this quantity of cocaine. Agent McAlpin offered expert testimony that this quantity of cocaine, possessing a purity level comparable to that seized on November 5, 2005, was consistent with distribution rather than personal use. This was supported by Beckford's testimony that, on at least one occasion, he and Roberts sent money representing "drug profits" to Jamaica to purchase more drugs. Trial Tr. at 404-05. The conspirators' successful distribution of the smuggled drugs could also be inferred from Beckford's testimony that Bourne and Roberts paid him between $2,000 and $10,000 each time he participated in an importation.

Roberts's objection to the district court's valuation for the cocaine merits more discussion. Contrary to Roberts's assertion, the government was not obliged to adduce "drug records" or evidence of specific "monetary transactions" to support a preponderance finding as to the dollar amount realized from the conspirators' distribution of the smuggled cocaine.

30

Def.'s Br. at 81-82. Conspiracies are, by their nature, shrouded in secrecy and, thus, such evidence may not always be available. Consequently, the law does not demand mathematical exactitude in calculating the proceeds subject to forfeiture. Indeed, because the purpose of forfeiture is punitive rather than restitutive, see Libretti v. United States, 516 U.S. 29, 41 (1995), district courts are not required to conduct an investigative audit to ensure that a defendant "is not deprived of a single farthing more than his criminal acts produced," United States v. Lizza Indus., Inc., 775 F.2d 492, 498 (2d Cir. 1985) (making observation in context of forfeiture of racketeering proceeds). Rather, district courts may "use general points of reference as a starting point" for a forfeiture calculation and "make reasonable extrapolations" supported by a preponderance of the evidence. United States v. Treacy, 639 F.3d at 48.

Here, Agent McAlpin, testifying as an expert witness with respect to drug values, provided the district court with two possible starting points for calculating the value of the distributed drugs when he stated, without contradiction, that at the time of the charged distribution conspiracy, a kilogram of high quality cocaine would have sold for a wholesale price of $24,000. Meanwhile, if such cocaine were "cut" or diluted to a strength consistent with street sales, it could command a retail price of $40 per gram. See generally United States v. Quiroz, 13 F.3d 505, 514 (2d Cir. 1993) (noting that "matters such as the price of a kilogram of cocaine in New York City . . . are appropriate areas" for expert testimony).

Roberts now faults the district court for using the retail rather than wholesale price for

cocaine as the multiplier in calculating proceeds realized from the crimes of conviction in his case. No such objection was raised in the district court. There, Roberts argued more generally that <u>any</u> reliance on an estimated value of the seized cocaine to extrapolate total proceeds was overly speculative and that <u>no</u> evidence showed the "wholesale or retail price negotiation regarding these alleged shipments." Def.'s Mem. of Law in Opp. to Gov't's Forfeiture Request at 6. Accordingly, we review the district court's use of a retail-value multiplier to estimate drug proceeds under the rigorous plain error standard. <u>See</u> <u>United States v. Paul</u>, 634 F.3d at 674.

The government argues that no error can be identified here because it is always "permissible" and "in fact the most reliable method" to use a retail-value multiplier in calculating drug proceeds. Gov't's Br. at 65. In support, it cites <u>United States v. Awad</u>, 598 F.3d 76 (2d Cir.), <u>cert denied</u>, 131 S. Ct. 613 (2010). In that case, involving the importation of khat plants, whose constituent cathinone is a controlled substance, the forfeiture amount was calculated by multiplying drug quantities by street value. <u>See</u> <u>id.</u> at 78. That use of retail value, however, was not at issue on appeal and, thus, we had no occasion to consider whether a retail-value multiplier was properly supported by the evidence in that case. <u>See</u> <u>id.</u> at 78 n.4. In <u>Awad</u>, we ruled only that a defendant was subject to a forfeiture order under 21 U.S.C. § 853(a)(1) even if he "possesses no assets at the time of sentencing." <u>Id.</u> at 78. Thus, <u>Awad</u> cannot decide this case.

More relevant to the identification of possible error is law that affords a district court

considerable discretion in estimating the proceeds realized from drug trafficking provided those estimates find support in a preponderance of the evidence. See United States v. Treacy, 639 F.3d at 47-48. Thus, if the evidence indicates that it is more likely than not that a conspiracy that imported drugs then distributed the contraband through to the street level, the use of a retail multiplier would certainly be warranted. But where there is no evidence of such a conspiracy engaging in more than wholesale distribution, then application of a retail-value multiplier would be error. Further, such a possible error would affect substantial rights. If the seventy-nine kilograms of cocaine here at issue were sold wholesale for $24,000 per kilogram, the realized proceeds would be $1,896,000, more than $1 million less than the proceeds calculated by using the $40 per gram retail multiplier. Cf. United States v. Thomas, 274 F.3d 655, 669 (2d Cir. 2001) (en banc) (concluding that imposition of imprisonment term higher than maximum term established by Congress affected defendant's substantial rights).

Here, the district court did not state its reasons for employing a retail rather than wholesale multiplier to calculate the conspiracy's drug proceeds. This is not surprising given that the government proposed this calculation,[7] and the defense did not urge that use of the wholesale value would be more appropriate. In short, there was no dispute to resolve. That is not the case on appeal where we consider a plain error challenge to the sufficiency of the

---

[7] At oral argument on appeal, the government acknowledged the seeming incongruity in its proposed forfeiture calculation, which multiplied a wholesale quantity of uncut cocaine by the retail value of diluted street cocaine. One would expect both quantity and price to be calculated at either the wholesale or the retail level.

evidence to support use of a retail multiplier. The record before us, however, does not permit us to decide conclusively whether evidence before the district court — whether at trial, in pre-trial proceedings, at sentencing, or in forfeiture discussions — could support a preponderance finding that this particular conspiracy distributed at the retail as well as the wholesale level. Thus, we do not here decide the question of plain error. Rather, we vacate the forfeiture order and remand the case to the district court for clarification of this matter. See United States v. Crosby, 397 F.3d 103, 118-19 (2d Cir. 2005); United States v. Jacobsen, 15 F.3d 19, 21-22 (2d Cir. 1994); see also United States v. Varrone, 554 F.3d 327, 333 (2d Cir. 2009) (vacating and remanding forfeiture order for further factual development regarding Eighth Amendment claim). On remand, the district court may expand the record as necessary to make factual findings on this question, and may modify the forfeiture order as warranted by the evidence.

**III.    Conclusion**

To summarize, we conclude as follows:

1. Excerpts from Roberts's proffer statements were properly admitted into evidence because the statements were (a) not induced by economic coercion in violation of the Fifth Amendment right against self-incrimination, and (b) admissible pursuant to a proffer agreement waiver of Fed. R. Evid. 410 to contradict factual assertions implied by documentary evidence that defense counsel insisted be placed before the jury.

2. Roberts's Sentencing Guidelines were correctly calculated to include an offense

level enhancement pursuant to U.S.S.G. § 3B1.3 because Roberts abused the position of trust conferred on him by his employer, which was a secondary victim of his crimes.

3. Sufficient evidence supports the district court's forfeiture finding that Roberts participated in a conspiracy that distributed seventy-nine kilograms of cocaine, but the record on appeal does not permit this court to reach the same sufficiency conclusion with respect to the use of a retail rather than a wholesale multiplier to determine the proceeds realized by the conspiracy from such distribution.

Accordingly, the judgment of conviction is AFFIRMED, but the order of forfeiture is VACATED AND REMANDED for further proceedings consistent with this opinion.