18-181(L)
*United States v. Tucker*

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2018

(Argued: June 12, 2019          Decided: June 2, 2020)

Docket No. 18-181(L), 18-184(CON), 18-1802

_____

UNITED STATES OF AMERICA,

*Appellee*,

v.

CRYSTAL GROTE, AKA CRYSTAL CRAM, AKA CRYSTAL CRAM-GROTE,
AKA CRYSTAL STUBBS,

*Defendant*,

*and*

TIMOTHY MUIR, SCOTT TUCKER,

*Defendants-Appellants*.

_____

Before:

LEVAL, POOLER, and PARKER, *Circuit Judges*.

Timothy Muir and Scott Tucker appeal from a judgment of conviction entered after a jury trial in the United States District Court for the Southern District of New York (P. Kevin Castel, *J.*) on fourteen counts including

collection of unlawful usurious debt, and conspiracy to do so, wire fraud, and money laundering, arising out of Defendants' operation of a payday lending business. The defense was primarily that the lending business was not subject to state usury laws because it was conducted by Native American tribes and was therefore protected by tribal sovereign immunity. Defendants' primary contention on appeal is that the district court erred in instructing the jury that willfulness—which the parties agreed was the required state of mind for a charge of lending at unlawful usurious rates—can be satisfied merely by the defendants' knowledge of the interest rates charged, even if they believed the lending was lawful. Because defendants made no objection following the charge as generally required by Fed. R. Crim. P. 30, and there was no basis to conclude that objection would have been futile, the plain error standard of Fed. R Crim. P. 52 applies. We conclude the error, if any, was not plain error. We also find no abuse of discretion in the district court's denial of Tucker's application for a stay of the forfeiture order against him. AFFIRMED.

THOMAS J. BATH, JR., Bath & Edmonds, P.A., Overland Park, KS, *for Defendant-Appellant Timothy Muir*.[1]

BEVERLY VAN NESS, Law Firm of Beverly Van Ness, New York, NY, *for Defendant-Appellant Scott Tucker*.

KARL METZNER (Hagan Scotten, Sagar K. Ravi, *on the brief*), Assistant United States Attorney, *for* Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY, *for Appellee*.

---

[1] Defendant Muir terminated Mr. Bath as counsel on September 20, 2018, and later submitted a supplemental brief *pro se*.

LEVAL, *Circuit Judge*:

Defendants Scott Tucker and Timothy Muir appeal their criminal convictions after a five-week jury trial in the U.S. District Court for the Southern District of New York (P. Kevin Castel, *J.*) on fourteen counts of racketeering, conspiracy, and fraud offenses arising out of the Defendants' operation of an illegal payday lending scheme. The evidence showed that from about 1997 to 2013, the Defendants lent money at interest rates far in excess of those permitted under the laws of New York and other states in which their borrowers resided, and deceived borrowers as to the terms of the loans.

The indictment included three counts of conducting an enterprise's affairs through the collection of unlawful usurious debt, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c) (Counts 2-4); one count of conspiracy to do the same, in violation of 18 U.S.C. § 1962(d) (Count 1); one count of wire fraud and one count of wire fraud conspiracy, in violation of 18 U.S.C. §§ 1343, 1349 (Counts 5-6); three counts of money laundering and conspiracy to launder money, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), -(a)(1)(B)(i), -(h) (Counts 7-9); and five counts of

making false statements in disclosures required by the Truth in Lending Act (TILA), in violation of 15 U.S.C. § 1611 (Counts 10-14). The Defendants were convicted on all counts.

At trial, the parties agreed—as they do now—that the requisite mental state for the RICO counts was willfulness. The Defendants defended primarily on the ground that, because the lending business was operated by Native American tribes (the "Tribes"), the loans were not subject to state usury laws, and that even if the loans were unlawful, Defendants had a good faith belief that they were lawful by virtue of the tribal involvement, so that their conduct was not "willful."

The Defendants' principal claim on appeal is that the district court erred in instructing the jury that the Government could satisfy the required state-of-mind element of collection of unlawful debt by proving that the Defendants acted deliberately, "with knowledge of the actual interest rate charged on the loan[s]," App'x at 264-65, notwithstanding any good faith belief that their conduct was lawful. Defendants contend that they could not be properly convicted on the charges of unlawful usurious lending unless they acted willfully, with knowledge that they were acting unlawfully.

4

We reject this challenge to the Defendants' convictions. Because the Defendants did not preserve their objection in the manner specified by Rule 30 of the Federal Rules of Criminal Procedure, the "plain error" standard of Rule 52 applies. Even assuming that the charge with respect to Counts 2-4 was erroneous, the error did not affect the verdict, and thus Defendants have not satisfied the requirements of "plain error." The jury necessarily found in rendering a guilty verdict on Count 1, for which an undisputedly correct willfulness instruction was given as to the "conspiracy" element, that the Defendants were aware of the unlawfulness of their making loans with interest rates that exceeded the limits permitted by the usury laws. Furthermore, the evidence of the Defendants' willfulness was overwhelming. We therefore find that the standard for a finding of plain error is not satisfied.

Concluding also that the Defendants' other contentions are without merit, we affirm the judgments of conviction on all fourteen counts. Additionally, we find that the district court did not abuse its discretion in denying Tucker's application to stay the execution of the forfeiture order entered against him following his conviction.

## BACKGROUND

Payday loans are small loans typically to be repaid on the borrower's next payday. Such loans frequently carry high interest rates. Many states, including New York, have usury laws capping the permissible annual interest rate on such loans, with the highest lawful interest rate varying by state.

From approximately 1997 through 2013, Defendant Tucker owned and operated a payday lending business based in Overland Park, Kansas. Initially, the business offered loans primarily via fax and telephone. In about 2000 it began to solicit payday borrowers over the internet, operating through several different websites which were held out to the public as separate entities, but which were administered from the same building and by the same employees, and were referred to internally as different "portfolios." Muir joined Tucker's business as an in-house attorney in 2005 or 2006. At its peak, the business had over 1,500 employees and 4.5 million customers, and generated more than a billion dollars in yearly revenue.

Tucker's loans were structured in the following manner. On each of the borrower's paydays following the loan disbursement (until the loan was repaid), the borrower's bank account was automatically debited a $30

"service charge" for each $100 remaining on the loan principal. On each of the first four paydays following disbursement, the loans would "automatically renew," meaning that the service charge would be assessed and no payment would be taken to reduce the outstanding principal balance. On the borrower's fifth payday and on each subsequent payday until the principal was repaid, in addition to the service charge, a "principal payment" of $50 would be taken from the borrower's bank account and applied to reduce the loan principal. According to a chart Tucker used to train his employees, based on this payment structure, a borrower would ultimately pay $975 to repay a $300 loan. Considering the service charges as interest, the resulting annualized interest rate (which varied depending on the frequency of a borrower's paydays) often exceeded 600%.

Borrowers were entitled under the terms of the loans to opt out of the "automatic renewal" process and instead pay the full amount of the principal (in addition to the service charge) on their first payday. To opt out of automatic renewal, borrowers were required to notify the lender in writing. A borrower of $300 who elected to opt out would pay a service charge of $90. The interest rates charged on the loans exceeded what was permitted in some

7

states, including New York, even when the loan was repaid on the first payday. And under the default automatic renewal process, the interest rates far exceeded those allowed by the applicable state usury laws. The written terms of the loans were materially misleading as to how the automatic renewal process worked and the borrowers' entitlement to opt out from it. A major source of borrowers' confusion regarding the automatic renewal process was the information in the "TILA Box" displayed in the loan documents. TILA—the Truth in Lending Act—requires lenders to make certain disclosures in a prominently displayed chart or "box" regarding the cost of prospective loans, including the loan amount, finance charge, annualized interest rate, and total amount of expected payments (including the principal). *See generally* 15 U.S.C. § 1638(a). The information listed in the TILA Box on Tucker's loan documents reflected what those costs would be *without* the "automatic renewal" process—that is, what a borrower would pay if she opted out of the automatic renewal process and paid off her entire loan on the first payday. Thus, for a loan of $300, the TILA box listed that the finance charge would be $90 and the total amount of payments (including principal repayment) would be $390. The disclosure was correct for

borrowers who opted out of automatic renewal. It did not reveal, however, that under the default payment schedule, the total finance charge on a loan of $300 would be $675 and the total payment would be $975. Nor did it adequately reveal (although setting it forth in small print and hyper-technical language outside the TILA box) that borrowers could decline the option of automatic renewal.

The indictment alleged that Tucker's enterprise charged interest rates well in excess of the maximum rates allowed for payday loans in at least 25 states and Washington, D.C., and that Tucker and Muir willfully conducted the affairs of the enterprise through the collection of unlawful debt. The indictment included four RICO counts: three for participating in the conduct of an enterprise's affairs through the collection of unlawful debt (Counts 2-4), and one for conspiracy to do so (Count 1). Each of the three substantive RICO counts (Counts 2-4) listed five customers, located in various states, as to whom the Defendants were charged with collecting unlawful debts. The district court instructed the jury that, to convict Defendants on Counts 2-4, the jury had to find that Defendants engaged in collecting at least one of the five unlawful debts listed in that count.

The Government's evidence showed that Tucker and Muir used three different "fronts," including the Tribes, to avoid detection of their usurious lending practices or to give those practices the appearance of legality. The first of these alleged fronts was Tucker's business relationship, from 1998 to 2004, with County Bank of Rehoboth Beach, Delaware ("County Bank"). As a nationally chartered bank, County Bank could lawfully lend anywhere in the United States at interest rates that complied with the law of the state in which it was headquartered. County Bank was headquartered in Delaware, which does not set a limit on consumer interest rates. Tucker thus endeavored to give his loans the appearance of legality by making it seem that County Bank was the "lender" and his business was merely the "servicer," while, in fact, he continued to own and operate the loans. He continued to provide the capital for the loans and to administer them through his Kansas office and through websites that he owned and controlled. Tucker's business continued to control loan approval, while County Bank set up a fake "approval process" to give the false impression that it was involved in decision-making. In exchange for what another County Bank "servicer," Adrian Rubin, described as "renting [County Bank's] name," the bank received 5% of the loan interest

regardless of whether the loans were actually repaid, and Tucker bore the entire loss when they were not.

As a second "front" strategy, during and subsequent to the County Bank scheme, Tucker attempted to hide his identity as lender by paying intermediaries to register a number of Nevada shell corporations, for which his loan portfolios served as the "doing business as" aliases. Rubin testified that Tucker used these aliases on certain documentation to make it harder for regulators to identify him as the lender. Tucker also used the Nevada addresses of the shell companies on loan documents to conceal the identity and location of his Kansas business from borrowers. This created problems when borrowers noticed that Tucker's employees called from a phone number with a Kansas area code of 913, which did not match with the company's purported address in Nevada, and asked the employees about the discrepancy. In response, Tucker told his employees to tell borrowers that the business was located in Nevada but that its phone calls were routed through an internet server located in Kansas; he later began to use a "1-800" phone number to avoid this issue.

Starting around 2003, Tucker formed relationships with a number of Native American tribes in order to create the appearance that Tucker's lending portfolios were owned and operated by the Tribes. Under the arrangement, the Tribe would claim to own one or more of the loan portfolios in exchange for one percent of the portfolios' revenues. As with his County Bank arrangement, Tucker continued to provide all the capital for the loans and bear the risk of default, as well as advertise, extend, administer, and collect on the loans from his offices in Overland Park, Kansas. He set up bank accounts in the Tribes' names and routed portfolio revenues to those accounts, but maintained control over the accounts and used them to fund both business expenses and personal expenses including race cars, a private jet, and a mansion in Aspen, Colorado. Tucker also used these accounts to pay the Tribes' one percent share of revenue, which went to other accounts that were in fact owned and controlled by the Tribes. While the Tribes claimed to "own" portfolios, Tucker maintained the ability to transfer "ownership" of a portfolio to a different nominal owner if he found the current nominal owner difficult to work with.

Tucker and Muir engaged in a variety of deceptive strategies to give the false appearance that the Tribes owned and operated the lending business. As with the Nevada shell corporations, the portfolios listed tribal mailing addresses rather than the business's actual location in Overland Park, Kansas. When the Tribes received mail for the lending business, they forwarded it to the Kansas office unopened. To keep up the appearance that the business was located on tribal land, Tucker's employees were instructed that they should never, on pain of termination, reveal the Kansas location to borrowers, and at least two employees were fired for doing so. This deception was taken to theatrical lengths: employees in the Kansas office regularly received weather reports for locations of the tribal reservations, so that they could make accurate small talk with borrowers about the weather in Oklahoma or Nebraska.

Meanwhile, on actual tribal land, Tucker and Muir built and staffed sham business office facilities, designed to make it appear that the Tribes were performing work to administer the loans, while in reality all the loan processing took place in Kansas. The Tribes were given iPads from which tribal officials were to access a website once a day to "approve" large swaths

13

of loans. However, the loans had already been approved by Tucker's employees in the Kansas office, the website did not allow the tribal officials to access the loan applications being "considered," and there was no mechanism for the officials to deny the loans. In addition, the Tribes formed sham corporate boards to run the portfolios, but the boards rarely met, had little understanding of the lending business in Kansas, and exerted no control over it. Tucker and Muir had the tribal officials perform these actions to give the false impression that they were involved in the approval and administration of the loans, while all such meaningful loan administration activity continued to occur at Tucker's business in Overland Park.

Tucker and Muir also arranged a sham transaction in which one of the Tribes purportedly purchased Tucker's loan processing company, CLK Management ("CLK"), which then changed its name to AMG Services ("AMG"). For the purchase of CLK, which made hundreds of millions of dollars in annual revenue, the Tribe ostensibly paid Tucker just over $135,000. However, the money in fact came from an account controlled by Tucker, meaning that Tucker paid himself in order to make it appear that the company had been purchased by the Tribe.

These charades were spectacularly successful, for a time. Tucker's loans attracted scores of complaints from borrowers and several investigations by state authorities. By invoking the Tribes' sovereign immunity, however, Tucker and Muir were able to successfully quash subpoenas from and secure dismissal of state regulatory enforcement actions. In doing so, Tucker's attorneys submitted false affidavits that materially misrepresented the role of the Tribes in the lending business. In addition, when a borrower complained that the loans were unenforceable under the law of her state, Tucker's employees responded that the loans were enforceable, and the borrower was obligated to pay, because the loan was owned by a Native American tribe.

While at trial Tucker and Muir disputed any intention to deceive, they did not meaningfully dispute that the above described actions took place. Prior to trial, they filed a motion to dismiss the unlawful debt counts, contending in relevant part that the loans did not constitute "unlawful debt" under 18 U.S.C. § 1961(6) because the loans were authorized under tribal law and were therefore not prohibited by state usury laws. The district court denied the motion, reasoning that, if the allegations in the indictment were true, because the loans were not issued by tribal entities but by businesses

controlled entirely by Tucker, and because the Tribes had no meaningful role in the business, principles of tribal sovereign immunity did not apply. At trial, Tucker and Muir argued that even if the loans were unlawful, their conduct was not "willful" because they had a good faith belief, based on advice of counsel regarding principles of tribal sovereign immunity, that their conduct was lawful.

As noted, after a lengthy trial, a jury convicted Tucker and Muir on all fourteen counts. The verdict sheet also posed a special interrogatory, to be answered subsequent to the jury's determination of guilt: "Has the government proven beyond a reasonable doubt that, at the time of collection of any of the loans you found as the basis of a guilty verdict on Counts Two through Four, the lender, in fact, was defendant Scott Tucker or an entity owned or controlled by him?" The jury answered, "Yes."

Additionally, following the Defendants' convictions, the court entered a preliminary forfeiture order against Tucker, including a money judgment in the amount of $3.5 billion and the forfeiture of certain specific property. Tucker moved for a stay of the forfeiture order pending appeal of his conviction, which the district court denied.

The Defendants appeal their convictions, and Tucker appeals from the district court's denial of the stay of forfeiture.

**DISCUSSION**

On this appeal seeking to set aside their convictions, Defendants' principal contention is that the court gave an erroneous and prejudicial jury instruction as to the mental state element of the usury-based charges. In the court's instruction to the jury on element six of Count 1 (which charged a RICO conspiracy to lend at rates that were usurious under various state laws), and by extension on Counts 2-4 (which charged substantive RICO offenses based on unlawful usurious lending), the court told the jury that the Government could show Defendants "willfully" participated in the conduct of Tucker's enterprise through the collection of unlawful debt if it proved that they "acted deliberately, with knowledge of the actual interest rate charged on the loan[s]." App'x at 264-65.

Defendants contend that this instruction was inconsistent with how willfulness is generally understood in the criminal context, which requires

17

that a defendant be aware of the unlawful nature of the conduct.[2] Moreover, Defendants conceded at trial that they were aware of the interest rates charged on the loans, but argued that they believed in good faith that their conduct was lawful. They contend that the erroneous charge in effect directed a verdict of guilty on Counts 1-4. The Government agrees that it was required to prove willfulness, but it contends that the instruction was correct.

We reject Defendants' challenge. Because Defendants failed to preserve their objection to the instruction in the manner prescribed by Federal Rule of Criminal Procedure 30, we review for plain error. Even assuming that the instruction was in error—a question we do not resolve—we find that the error does not satisfy the plain error standard. Taken together with other instructions given by the court to the jury, the instruction now challenged did not affect Defendants' substantial rights, did not "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," *Johnson v. United States*, 520 U.S. 461, 467 (1997), and did not cause a "miscarriage of

---

[2] *See Bryan v. United States*, 524 U.S. 184, 191-92 (1998) ("As a general matter, when used in the criminal context, a 'willful' act is one undertaken with a 'bad purpose,'" such that "in order to establish a 'willful' violation of a statute, 'the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994))).

justice," *United States v. Frady*, 456 U.S. 152, 163 (1982). Indeed we conclude, based on the jury's findings under other instructions, that the instruction alleged to have been error had no effect whatsoever on the verdict. Accordingly, reversal is not warranted under the plain error standard. We also reject Defendants' other arguments as without merit.

## I. Willfulness Charge

### a. Plain Error Review Applies

Where a claim of error in the court's instruction to the jury is properly preserved, we review that claim *de novo*, reversing if, "viewing the charge as a whole, there was a prejudicial error." *United States v. Quattrone*, 441 F.3d 153, 177 (2d Cir. 2006). In order to be preserved, an objection to the jury instructions must be made by "inform[ing] the court of the specific objection and the grounds for the objection before the jury retires to deliberate." *See* Fed. R. Crim. P. 30(d). This objection generally must occur after the instruction is given to the jury, that being the court's clearest opportunity to fix a mistake that might otherwise require retrial. *See Fogarty v. Near North Ins. Brokerage, Inc.*, 162 F.3d 74, 79 (2d Cir. 1998). Failure to object in the manner prescribed by the rule, so as to give the court a clearly framed opportunity to

correct an error in the charge, results in forfeiture of *de novo* review of the error. Where the claim of error in the charge is not properly preserved, it is reviewed instead under the far more exacting standard of *plain error*, as specified in Rule 52(b). Fed. R. Crim. P. 30(d). ("Failure to object in accordance with [Rule 30(d)] precludes appellate review, except as permitted under Rule 52(b).").

The preclusion of *de novo* appellate review, however, is not absolute. If the party that failed to object following the jury charge had previously objected, making its position clear, and it was evident in the circumstances that renewal of the objection would be futile because the court had clearly manifested its intention to reject the objection, the failure to renew the objection as specified in Rule 30(d) does not forfeit *de novo* review. *See United States v. Rosemond*, 841 F.3d 95, 106-07 (2d Cir. 2016) (a defendant's failure to renew an objection will not forfeit *de novo* review if "taking further exception under the circumstances would have been futile"); *see also United States v. Freeman*, 357 F.2d 606, 613 (2d Cir. 1966) ("Since it is apparent that both Court and counsel were fully cognizant of the issues being raised— and since any further showing would have been an exercise in futility— it is entirely proper

that we consider the [issue raised] on appeal."); *cf. Thornley v. Penton Publ'g, Inc.*, 104 F.3d 26, 30 (2d Cir. 1997) (holding, in the civil context, in which a similar principle applies, that the futility standard was met where an appellant had "argued its position to the district judge, who rejected it, [and] a further exception after delivery of the charge would have been a mere formality, with no reasonable likelihood of convincing the court to change its mind on the issue").

Although the Defendants had argued their position at a mid-trial charge conference, neither raised an objection to the instruction following the jury charge. App'x at 300. Accordingly, their objection to the willfulness charge is subject to plain error review unless "taking further exception under the circumstances would have been futile." *See Rosemond*, 841 F.3d at 107.

We see no basis for concluding that it would have been futile for Defendants to renew their objection. When the issue was earlier discussed at the charge conference, the court expressed uncertainty as to how to charge on state of mind. App'x at 210-17. The next day, counsel for Muir raised the issue again, arguing that the statement in the proposed charge that the Government could show willfulness by proving that the Defendants "acted deliberately

21

with knowledge of the actual interest rate" was inconsistent with the definition of willfulness and should be removed. *Id*. at 228. After listening to argument on the question, the court thanked counsel and ended the session without giving a conclusive response. *Id*. at 230. Indeed, as Tucker acknowledged in his appellate brief, "The court thanked counsel for her comments but *did not rule on the objections*." Tucker Br. at 38 (emphasis added).

On that record, it cannot be said that the district court had rejected the Defendants' position, making clear that a further objection after delivery of the charge "would have been a mere formality, with no reasonable likelihood of convincing the court to change its mind on the issue." *Thornley*, 104 F.3d at 30. Had the Defendants reasserted their argument after the charge, it is entirely possible that the court would have accepted the argument and given a new instruction on the required state of mind, conserving judicial resources by obviating the need for appeal and potential retrial. Accordingly, we review for plain error.

### b. The Error, If Any, Does Not Satisfy the Requirements of "Plain Error"

When the plain error standard of review applies, the Court of Appeals may vacate a conviction on account of a challenged jury instruction if the

22

instruction contains "(1) error, (2) that is plain, and (3) that affect[s] substantial rights." *United States v. Botti*, 711 F.3d 299, 308 (2d Cir. 2013) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)). In addition, the error must "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Johnson*, 520 U.S. at 467 (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)). In most cases, to "affect substantial rights" the error "must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. The Supreme Court has cautioned that Rule 52(b) authorizes the Courts of Appeals to correct "particularly egregious errors," and is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *Frady*, 456 U.S. at 163 & n.14; *accord United States v. Young*, 470 U.S. 1, 15 (1985). The burden is on the defendant to demonstrate that these criteria for relief are met. *United States v. Boyland*, 862 F.3d 279, 289 (2d Cir. 2017).[3]

---

[3] In *United States v. Viola*, 35 F.3d 37, 41-42 (2d Cir. 1994), *abrogated on other grounds by Salinas v. United States*, 522 U.S. 52 (1997), this circuit held that where an error results from a supervening decision that alters the applicable law, the burden is on the *government* with respect to the third element of plain error analysis to show that the error was *not* prejudicial. We have repeatedly expressed doubt whether this "modified" version of plain error review survived the Supreme Court's decision in *Johnson v. United States*, 520 U.S. 461

We conclude that, even if the challenged instruction was erroneous, the error did not satisfy the requirements of the plain error standard. In instructing the jury as to willfulness in regard to the conspiracy element of Count 1 (the RICO conspiracy count), the court barred the jury from rendering a guilty verdict on that count unless it found beyond a reasonable doubt that the Defendants were aware of the unlawfulness of their lending scheme. The guilty verdict on Count 1 thus demonstrates that the jury was satisfied beyond a reasonable doubt that the Defendants acted with the mental state that Defendants argue was required for Counts 2-4.

In its charge on Count 1, the court instructed the jury on willfulness twice: (1) in the context of element two, that the Defendants "knowingly and willfully joined the conspiracy;" and (2) in the context of element six, that the Defendants "willfully and knowingly agreed to participate . . . in the affairs of the Tucker payday organization through collection of an unlawful debt." The portion of the instruction Defendants now challenge applied only to element

(1997). *See Boyland*, 862 F.3d at 289. We have no occasion to decide that issue here, because the error did not result from a supervening decision, and so, even assuming that *Viola* remains good law, its "modified plain-error" standard would not apply.

six (and was incorporated by reference into the instructions for the substantive RICO counts, Counts 2-4).

As to element two (knowingly and willfully joining the conspiracy), the court instructed the jury that "[w]illfully means to act deliberately and with a purpose to do something that the law forbids," and that to be convicted under Count 1 the Defendants "must have been aware of the generally unlawful nature of [their] act[s]." App'x at 258-59. The jury found the Defendants guilty under Count 1. Therefore, the jury necessarily found that they knew the unlawful nature of the lending they conspired to engage in—the same lending that formed the basis of element six and that was charged as a substantive offense in Counts 2-4. Because the jury found in connection with the conspiracy element that the Defendants were aware of the unlawful nature of their conduct, there is no risk that the jury could have found them guilty on the "collection of an unlawful debt" element of Counts 1-4, involving the loans that were the object of the conspiracy charged in Count 1, without being satisfied beyond a reasonable doubt that the Defendants were aware of the unlawful nature of their conduct.

Furthermore, the Government presented overwhelming evidence that Defendants were aware of the unlawful nature of the loans, in the form of Defendants' extensive efforts to conceal their lending activities and to create a sham illusion that the lending was done by Native American tribes, precisely so that state usury laws would not seem to apply. *See United States v. Atkins*, 869 F.2d 135, 139 (2d Cir. 1989) (finding "specious" defendants' claim that they were unaware that their actions were illegal, in light of the strength of evidence of lies and concealment); *see also Bryan*, 524 U.S. at 189 & n.8 (concluding that willfulness in illegal firearms sales was satisfied by showing that defendant used "straw purchasers" and shaved off gun serial numbers).

Uncontradicted evidence showed that the Defendants: (1) prohibited employees from revealing the business's Kansas location, and instructed them to falsely claim that they were located on tribal land; (2) caused mail related to the lending business to be sent to the Tribes and then forwarded unopened to the Kansas office, giving a false impression that lending activity occurred on tribal lands; (3) required tribal officials to perform fake loan approvals on designated iPads in order to give the appearance that they were involved in the loan approval process; (4) set up a sham transaction in which AMG, a

company controlled by Tucker, "purchased" CLK (using money controlled by Tucker) in order to give the appearance of tribal ownership; and (5) caused attorneys to submit affidavits in state court actions that contained inaccurate descriptions of a purported tribal role in administering the loans. In light of this evidence, we have no doubt that, if the willfulness instruction challenged by Defendants was erroneous, the error did not affect the verdict.

The court's charge did not adversely "affect[] substantial rights," *Botti*, 711 F.3d at 308, "seriously affect[] the fairness, integrity, or public reputation of judicial proceedings," *Johnson*, 520 U.S. at 467, or cause a "miscarriage of justice" in these circumstances, *Frady*, 456 U.S. at 163. Defendants' argument is that the jury should not have been allowed to convict on the substantive unlawful debt counts unless it found that the Defendants were aware of the unlawful nature of their conduct. Taking into account the charge as a whole, the jury did find (based on overwhelming evidence of that fact) that the Defendants were aware of the unlawful nature of the lending scheme.

In reaching this conclusion, we express no view on whether willfulness or awareness of unlawfulness was required for conviction under Counts 2-4. We note, however, that were it not for the fact that the Defendants failed to

satisfy the plain error standard, we would face confusing and arguably incompatible precedents regarding the required mental state for a RICO offense involving unlawful debt. One source of the difficulty is that a RICO unlawful debt offense can be predicated on a violation of a state's *civil* usury statute, and that many such civil statutes impose no state of mind requirement at all. Certain applications of RICO in this context are thus in tension with the Supreme Court's recent reaffirmation of a "presumption in favor of a scienter requirement" applicable to "each of the statutory elements that criminalize otherwise innocent conduct." *Elonis v. United States*, 135 S. Ct. 2001, 2011 (2015) (quoting *United States v. X-Citement Video, Inc.*, 513 U.S. 64, 72 (1994)). Although we need not, and do not, resolve these issues here, we discuss them briefly in the hope of exposing some of the potential problems.

For starters, our 1986 opinion in *United States v. Biasucci*, 786 F.2d 504 (2d Cir. 1986), written in the early days of RICO adjudications, ostensibly adopted two incompatible state-of-mind standards. The case, like this one, involved a RICO prosecution for collection of debts that were unlawful under state law. On the one hand, our opinion declared that RICO requires "that the defendant acted knowingly, willfully and unlawfully," *Biasucci*, 786 F.2d at

28

513—the statement Defendants here rely on for their argument that the Government was required to prove willfulness. At the same time, the *Biasucci* opinion upheld the RICO convictions on the ground that RICO imposes no mental state requirement beyond that required by the predicate state statute. *Biasucci*, 786 F.3d at 512. The issue raised on the appeal was the defendants' contention that the government was required to prove their knowledge of the specific interest rates being charged on the loans they were collecting. We affirmed the convictions on the ground that there was no such requirement under the predicate state statute and therefore no such requirement imposed by RICO. The prosecution was predicated on the defendants' violation of New York Penal Law § 190.40. That statute required proof that the defendant knowingly took or received interest at a rate exceeding 25% per annum. It did not, however, require that the defendant know either the precise rate being charged, or that the rate was illegal.[4] Accordingly, after stating in dictum that

---

[4] The statute's phrase "knowingly charges . . . any money or other property as interest . . . at a rate exceeding twenty-five per centum per annum," N.Y. Penal Law § 190.40 (McKinney Supp. 1986), might conceivably be read to require knowledge that 25% was the maximum lawful rate—which, combined with the knowledge that the rate charged exceeded 25%, would constitute knowledge of unlawfulness. However, the Court of Appeals had previously made clear in *Freitas v. Geddes Savings & Loan Ass'n*, 63 N.Y.2d 254

RICO requires proof that the defendant acted willfully, the court upheld the convictions based on a standard that did not require a showing of willfulness or of awareness of the unlawful nature of the conduct.

Apart from its internal inconsistency, the *Biasucci* holding that no proof of state of mind is required beyond what is required by the state statute can be difficult to reconcile with the Supreme Court's later insistence in *X-Citement Video* and *Elonis* on a "presumption [in the interpretation of criminal statutes] in favor of a scienter requirement," applicable to "each of the statutory elements that criminalize otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2011. The *Biasucci* formulation would, under certain circumstances,

---

(1984), that § 190.40 does not require knowledge of the unlawfulness of the act. Although *Freitas* involved a civil usury statute and not § 190.40, the majority characterized the dissent's test—under which "knowingly" requires "knowledge that the facts exist which constitute the offense, not knowledge of the unlawfulness of the act"—as being "akin to the standard utilized by [§ 190.40]." *Freitas*, 63 N.Y.2d at 264; *id.* at 267 (Simons, J., dissenting). Similarly, as to the civil statute at issue, the *Freitas* majority noted that "[i]f the note or bond shows a rate of interest higher than the statutory lawful rate, it would be immaterial whether the lender actually intended to violate the law." *Id.* at 262. Thus, while "knowingly" in § 190.40 might on its face be read to require awareness of unlawfulness, precedent made clear that "knowingly" was satisfied by knowledge that the interest rate exceeded 25%, regardless of whether the defendant was aware that such rate was unlawful.

authorize conviction under RICO of a defendant who neither knew the rate of interest charged nor that the rate charged was illegal.

That difficulty is exacerbated if the principle espoused in *Biasucci* (and other cases)—that RICO imposes no knowledge requirement beyond what is imposed by the predicate state law—applies even when the unlawfulness under state law is predicated on a state *civil* statute.

RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of racketeering activity. *See* 18 U.S.C. § 1962; *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991). While "racketeering activity" is generally understood to encompass only criminal offenses, *see Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 247 (2d Cir. 1985), the RICO statute defines "unlawful debt" to include any debt "which is *unenforceable* under State or Federal law . . . because of the laws relating to usury" and "which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6) (emphasis added). This definition "includes debts that would be usurious under the laws of several states, and hence unenforceable,

but that would not violate [any state] *criminal* usury laws." *Durante Bros.*, 755 F.2d at 247 (emphasis in original). Thus, the criminal RICO offense of participating in the conduct of an enterprise's affairs through collection of unlawful debt may arguably be predicated on a violation of only civil usury laws.

Some such state civil statutes render debt unlawful and unenforceable solely by reason of the rate of interest charged, without regard to the mental state of the lender or collector. Such statutes provide simply that loans carrying an interest rate above a specified threshold are void and unenforceable. A debt charging interest that exceeds the threshold rate and is incurred in connection with the business of lending money at twice the enforceable rate would thus appear to fit within the definition of "unlawful debt" under 18 U.S.C. § 1961(6), and could thus arguably serve as the predicate for a RICO offense, regardless of what the lender knew or intended.

Indeed, several of the state usury statutes underlying the RICO charges in this case are of precisely this nature. For instance, the payday loan statute in New Hampshire, which was the location of one of the customers named in Count 2, provides: "The annual percentage rate for payday loans shall not

32

exceed 36 percent," N.H. Rev. Stat. § 399-A:17(I), and makes payday loans in excess of 36 percent unenforceable, regardless of mental state, *see id.* § 399-A:23(VIII) ("If charges in excess of those permitted by this chapter shall be charged . . . the contract of loan shall be void and the lender shall have no right to collect or receive any charges, interest, or recompense whatsoever."). Similarly, New York's *civil* usury statute, which was specifically listed in the indictment, and which applies to loans listed in all three substantive RICO counts, provides that the maximum interest rate "shall be sixteen per centum per annum." N.Y. Banking Law § 14-a(1); N.Y. Gen. Oblig. Law § 5-501. The New York law also provides that "[a]ll bonds, bills, notes, assurances, conveyances, all other contracts or securities whatsoever . . . whereupon or whereby there shall be reserved or taken . . . any greater sum, or greater value, for the loan or forbearance of any money, . . . than is prescribed in section 5-501, shall be void." N.Y. Gen. Oblig. Law § 5-511. Thus, loan contracts with an interest rate exceeding 16% are unenforceable under New York's civil usury law, regardless of the mental state of the lender.

It is unclear whether the *Biasucci* court would have intended its holding, that "RICO imposes no additional *mens rea* requirement beyond that

found in the predicate crimes," *Biasucci*, 786 F.2d at 512, to apply also to criminal RICO charges predicated on *civil* usury statutes such as these. *Biasucci* itself involved a RICO offense that was based solely on New York's *criminal* usury statute. And *Biasucci* consistently refers to the predicate *crimes*, perhaps suggesting that the court did not contemplate that the same rule would apply to RICO offenses based on loans that were unenforceable under state *civil* usury statutes. Moreover, the cases that *Biasucci* relied upon for that rule involved racketeering-based RICO charges predicated on criminal violations of the Taft-Hartley Act. *See United States v. Boylan*, 620 F.2d 359 (2d Cir. 1980); *United States v. Scotto*, 641 F.2d 47 (2d Cir. 1980). None involved RICO charges based on civil statutes. If, however, a defendant may be convicted under RICO for participation in the making or collecting of a loan merely because a state civil statute renders the loan unenforceable by reason of the interest rate, without any requirement whatsoever as to the defendant's state of mind, in some circumstances this would authorize racketeering convictions where the defendant had not only committed no state law offense, but had done nothing that would offend social mores.

As noted above, a RICO prosecution can be predicated on a single instance of collection of unlawful debt. And what the RICO statute calls an "enterprise" can be "any individual, partnership, corporation, association, or other legal entity," 18 U.S.C. § 1961(4)—so long as it is "engaged in, [or its activities] affect, interstate commerce," *id.* § 1962(c). And high interest rates can result from application of reasonable service fees to small debit balances in circumstances that do not partake of the predatory lending practices exhibited in this case (or those seen in *Biasucci*). Consider a store that sells goods coming from different states, which allows customers charge accounts and follows a policy for accounts that remain unpaid after four months to impose a modest one-time $15 service fee (considered interest under usury laws) and begin charging interest at an unobjectionable rate. An employee who "participates in the conduct" of the business's affairs by overseeing the billing process,[5] say, the credit manager, might face federal criminal liability

---

[5] The statutory requirement that the defendant "conduct or participate . . . in the conduct" of the enterprise's affairs, 18 U.S.C. § 1962(c), likely shields the lowest rung of employees from RICO liability. *See Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993) (requiring that the defendant have "*some* part in directing the enterprise's affairs" to be liable under § 1962(c) (emphasis in original)); *United States v. Viola*, 35 F.3d 37, 41 (2d Cir. 1994) (finding erroneous under *Reves* a jury instruction that permitted conviction as long as the defendants

35

as a racketeer, although having committed no offense under state law or even acted unreasonably, for mailing a monthly bill that charged the $15 fee where the customer's unpaid balance was sufficiently small. If RICO liability requires no proof of state of mind other than what is required to show that the loan is unenforceable under the predicate state statute and this rule applies where unenforceability under state law depends on only the interest rate (without regard to state of mind) or even where, as in *Biasucci*, criminal liability under the state's law does not require awareness of the illegality of the rate, this can produce criminal liability for racketeering for unexceptionable conduct. We have serious doubts that such a rule

---

performed duties that were "necessary and helpful" to the operation of the RICO enterprise). But the Supreme Court in *Reves* clarified that § 1962(c) could extend to "lower rung" participants who participate in the operation of the enterprise, and it declined to decide "how far § 1962(c) extends down the ladder of operation." *Reves*, 507 U.S. at 184 & n.9. We know of no case setting a precise lower bound for the position within the ladder required for § 1962(c) liability, but it is clear that some degree of discretionary authority is sufficient. *See United States v. Diaz*, 176 F.3d 52, 92-93 (2d Cir. 1999) (holding that evidence was sufficient to meet the *Reves* standard because defendants were "on the ladder [of operation], rather than under it" and exercised "discretionary authority" in carrying out instructions). Thus, many "lower rung" employees remain potentially subject to RICO charges for their activities relating to a RICO enterprise.

appropriately "separate[s] wrongful conduct from otherwise innocent conduct." *Elonis*, 135 S. Ct. at 2010 (internal quotation marks omitted).

Because, as explained above, the jury necessarily found that the Defendants acted willfully in rendering a guilty verdict on Count 1, and because the evidence of willfulness was overwhelming in any event, the Defendants have not met their burden of showing plain error. While the issues we have discussed will pose troublesome questions in future cases, we have no occasion to resolve those difficulties in this case, and do not purport to do so.

## II.  Defendants' Other Arguments Are Without Merit

Defendants also argue (1) the district court erred by excluding the testimony of Defendants' expert witness, attorney Gavin Clarkson, on the topic of tribal sovereign immunity; (2) there was insufficient evidence that Defendants engaged in wire fraud by misleading borrowers to believe that Native American tribes were the true lenders, because Defendants had a good faith belief that the Tribes were in fact the lender; and (3) the loans here did not constitute "unlawful debt" as defined under RICO because, due to

principles of tribal sovereign immunity, state usury laws are not

"enforceable" against tribal loans. These contentions are without merit.

We reject Defendants' contention that the district court erred by excluding Clarkson's testimony. A district court's decision to exclude expert testimony is reviewed for abuse of discretion. *Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 357 (2d Cir. 2004). Regardless of whether Clarkson's testimony was being offered to show that Defendants had an innocent state of mind regarding the legality of their loans, or to show that their lending practices were in fact not illegal, the court committed neither error nor abuse of discretion in excluding it. As to the former issue, Clarkson did not advise the Defendants, and so his proposed testimony would not have been probative of what they understood. As for the legal issue of the lawfulness of the loans, "[w]e have consistently held . . . that expert testimony that usurps . . . the role of the trial judge in instructing the jury as to the applicable law . . . by definition does not aid the jury in making a decision," and is therefore inadmissible under Federal Rule of Evidence 702. *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005) (internal quotation marks and citation omitted).

We also reject Defendants' contention that there was insufficient evidence of wire fraud consisting of misrepresenting the identity of the lender. On a defendant's challenge to his conviction based on the sufficiency of evidence, "we view the evidence in the light most favorable to the government, drawing all inferences in the government's favor." *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008) (internal quotation marks omitted). There was extensive evidence that Defendants were aware that the Tribes were not the true lender, and that they falsely represented this was the case in order to evade state regulators and to convince borrowers to make payments on the unlawful terms they offered. Testimony of multiple witnesses established that the Tribes had no meaningful influence or control over the lending business, but rather served merely as a cover. Defendants made extensive and sometimes extraordinary efforts, described above, to create a false impression that the Tribes were involved in the lending. The evidence was more than sufficient for the jury to conclude that Tucker and Muir knew that the Tribes were not the lender, but falsely represented that they were.

We reject Defendants' argument that the loans were not "unlawful debt" as defined by RICO because, due to principles of tribal sovereign

39

immunity, state usury laws are not enforceable against tribal loans. The district court correctly concluded (in its opinion denying Defendants' motion to dismiss the indictment) based on the facts alleged in the indictment—and subsequently demonstrated at trial—that the Tribes' involvement in the lending business was a sham, so that principles of tribal sovereign immunity had no application to Tucker's non-tribal business. We reject the Defendants' further contentions as frivolous.

### III. The District Court Did Not Abuse Its Discretion In Denying Tucker's Application For a Stay of the Forfeiture Order

Tucker also argues that the district court erred in denying his application to stay execution of the forfeiture order against him pending his appeal of the underlying convictions. Following Tucker's conviction, in April 2018 the district court entered a preliminary forfeiture order against him, including a money judgment in the amount of $3.5 billion and the forfeiture of certain specific property, including ten cars, two residences, and jewelry. Tucker moved for a stay of the forfeiture order in the district court, arguing he was likely to succeed on the merits of his appeal, that the property at issue would likely increase in value and had intrinsic value to him, and that the

government could offset the cost of maintaining the property pending the outcome of his appeal by renting the real property. The district court rejected Tucker's motion, finding that under the factors set out in *United States v. Silver*, 203 F. Supp. 3d 370, 385 (S.D.N.Y. 2016), Tucker's likelihood of success on appeal was low, and the cost to the government of maintaining the assets would be high. The district court did, however, impose a stay as to the sale of the family residence. Tucker then appealed from the denial of the stay of the forfeiture order.

A district court may stay a forfeiture order pending appeal "on terms appropriate to ensure that the property remains available pending appellate review." Fed. R. Crim. P. 32.2(d). While neither the Federal Rules nor this Court's precedent set out factors that pertain explicitly to stays of forfeiture orders, we have expressed standards generally governing applications to stay district court orders or proceedings pending appeal as follows: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *In re*

*World Trade Ctr. Disaster Site Litig.*, 503 F.3d 167, 170 (2d Cir. 2007) (internal quotation marks and footnote omitted); *see also United States v. Gelb*, 826 F.2d 1175, 1177 (2d Cir. 1987) (applying traditional stay factors in deciding an interlocutory appeal of a pretrial restraining order enjoining the transfer of assets subject to criminal forfeiture). We review the denial of a stay for abuse of discretion. *See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 856 (2d Cir. 1997).

The district court, like others in our circuit facing similar fact patterns, applied the slightly modified version of the traditional stay factors articulated by the district court in *Silver*: "1) the likelihood of success on appeal; 2) whether the forfeited asset is likely to depreciate over time; 3) the forfeited asset's intrinsic value to defendant (i.e., the availability of substitutes); and 4) the expense of maintaining the forfeited property." *Silver*, 203 F. Supp. 3d at 385; *see also United States v. Ngari*, 559 F. App'x 259, 272 (5th Cir. 2014) (analyzing denial of stay by considering "(1) the likelihood of success on appeal; (2) whether the forfeited assets will depreciate over time; (3) the forfeited assets' intrinsic value to the defendant; and (4) the expense of maintaining the forfeited property").

Under any such test, we hold that the district court did not abuse its discretion in denying Tucker a stay of the forfeiture order. Tucker was indeed unlikely to succeed on the merits of his appeal. Nothing in the record contradicts the district court's finding that the cost of maintaining the assets was high, and that the property had no intrinsic value for Tucker; nor did the record show that the property was more likely to increase, than decrease, in value.

**CONCLUSION**

For the foregoing reasons, the judgment of the district court is AFFIRMED.